1  GARY M. RESTAINO
   United States Attorney
2  District of Arizona
   MARK J. WENKER
3  Assistant United States Attorney
   Arizona State Bar Number 018187
4  Two Renaissance Square
   40 North Central Avenue, Suite 1800
5  Phoenix, Arizona 85004-4408
   Telephone: (602) 514-7500
6  Mark.wenker@usdoj.gov
   Attorneys for Plaintiff
7

8                    UNITED STATES DISTRICT COURT

9                         DISTRICT OF ARIZONA

10 United States of America,

11               Plaintiff,              **VERIFIED COMPLAINT FOR
                                          FORFEITURE *IN REM***
12        v.

13 Real Property Located at 521 Holiday
   Drive, Hallandale Beach, FL 33009,
14
                 Defendant *In Rem*.
15

16        Plaintiff United States of America brings this complaint and alleges as follows in

17 accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules

18 for Admiralty or Maritime Claims and Asset Forfeiture Actions:

19                        **BASIS FOR FORFEITURE**

20        1.    This is a civil action *in rem*, brought to enforce the provisions of 18 U.S.C.

21 § 981(a)(1)(C) for the forfeiture of property, real or personal, which constitutes or is

22 derived from proceeds traceable to a violation of a specified unlawful activity, including

23 but not limited to, wire fraud, 18 U.S.C. § 1343, and a drug trafficking offense, 21

24 U.S.C. § 841, *et seq*.

25        2.    This is a civil action *in rem*, brought to enforce the provisions of 18

26 U.S.C. § 981(a)(1)(A) for the forfeiture of property, real or personal, involved in a

27

28

transaction or attempted transaction in violation of a money laundering offense, 18 U.S.C. §§ 1956 and 1957.

## JURISDICTION AND VENUE

3. This Court has jurisdiction because the United States commenced this action and because it seeks forfeiture. 28 U.S.C. §§ 1345, 1355(a). Venue is proper in this District because acts or omissions giving rise to forfeiture occurred in this District. 28 U.S.C. § 1355(b)(1)(A).

## DEFENDANT IN REM

4. Defendant is real property at 521 Holiday Drive, Hallandale Beach, FL 33009, and more specifically described as follows:

> Legal Description: Lot 1, Block 1, GOLDEN ISLES ESTATES, according to plat thereof as recorded in Plat Book 94, Page 94, of the Public Records of Broward County, Florida. Assessor Parcel Number: 5142-35-02-0010

(the "Holiday Drive Property").

## FACTS

### *Investigation of Salvatore Frank Vaccaro*

5. Since October 2020, the Drug Enforcement Administration (DEA) Phoenix Field Division's Strike Force Group 1 has been investigating Salvatore Frank Vaccaro ("VACCARO") for drug trafficking and money laundering for a Transnational Criminal Organization ("TCO") based in Scottsdale, Arizona.

6. VACCARO, a Canadian citizen, was admitted into the United States June 12, 2019, under admission code B1 (B1 Visa). Under a B1 Visa, VACCARO was authorized to remain in the United Stated for six months. VACCARO's B1 expired on December 11, 2019. Under the B1 Visa program, VACCARO is allowed the opportunity to petition to remain in the United States for an additional six months. VACCARO has no petitions on record requesting this extension and therefore should have departed the United States on or before December 11, 2019.

7. The investigation of VACCARO and the TCO has led to the identification of

1   members of the TCO, as well as the identification of at least one law enforcement drug

2   seizure associated with the TCO and VACCARO. The seizure of approximately 64

3   kilograms of cocaine occurred in June 2019 by the DEA Los Angeles Field Division

4   Southwest Border 2 ("SWB2") from a member of the VACCARO TCO, as further

5   detailed below.

6        8.   On June 5, 2019, SWB2 was conducting surveillance operations on an

7   ongoing investigation involving a Drug Trafficking Organization ("DTO") trafficking

8   narcotics in the Los Angeles, California area.  During surveillance, officers observed a

9   subject ("Subject1"), who has since been charged with a drug trafficking offense,

10  meeting a third party in a shopping center parking lot in Ontario, California.

11  Surveillance officers observed Subject1 hand a duffle bag to the third party who then

12  gave a brown box to Subject1.

13       9.   Surveillance officers conducted a traffic stop on Subject1 as he left the

14  parking lot.  During the stop, officers seized approximately 64 kilograms of cocaine in

15  the brown box. Subject1 was arrested on state of California narcotics charges.

16       10.  Following the arrest of Subject1, officers conducted a recorded interview

17  with Subject1 regarding the seizure of the cocaine. Subject1 was advised of his *Miranda*

18  rights and given a *Miranda* warning form which he signed.

19       11.   During the interview, Subject1 indicated the cocaine was destined for

20  Canada and that the transaction was coordinated by "Salvador Francesco Viccaro"

21  (believed to be VACCARO), a Canadian citizen living in Arizona.

22       12.  Subject1 stated that beginning in February or March of 2019 Subject1 had

23  picked up cocaine for VACCARO on four previous occasions in the Los Angeles,

24  California area.

25       13.  Subject1 stated that once Subject1 picked up the cocaine, Subject1 would

26  deliver it to an unknown courier who would then deliver it to a commercial truck driver

27  for transport to Canada.

28

14. Subject1 stated that the largest amount of cocaine that he picked up was 212 kilograms in Los Angeles approximately two months prior to his arrest.

15. Subject1 told the officers VACCARO followed him to California from Arizona each time, and they stayed at the same hotel in separate rooms. According to Subject1, VACCARO would physically open each kilogram of cocaine and do a quality check of the cocaine.

16. Subject1 stated VACCARO resided at 8739 E. Quartz Mountain Drive, Gold Canyon, Arizona.

17. Subject1 stated that VACCARO had up to six cellular phones that he would use but Subject1 only had one number saved in his Samsung cellular telephone.

18. Subject1 verbally consented to a search of his cellular phone and provided VACARRO's phone number (###) ###-7985.

19. Investigators submitted an administrative subpoena to AT&T for Subscriber information for telephone number (###) ###-7985. The AT&T response revealed (###) ###-7985 was a prepaid phone active from May 7, 2019, to July 7, 2020, with no subscriber listed.

20. Based upon training and experience, investigators know that drug traffickers often use prepaid phones with no subscriber information listed in order to thwart law enforcement efforts at locating and identifying the user of the phone.

21. Toll records for (###) ###-7985 from June 26, 2020, to October 20, 2020 identified thirty-three contacts with telephone number (###) ###-8464 from June 26, 2020, to October 14, 2020. The telephone number (###) ###-8464 was subscribed to someone who has been identified as a source of supply for cocaine and was involved in a 100-kilogram cocaine seizure in August 2020 ("Subject2").

22. Investigators conducted a query of a law enforcement database on VACCARO in October 2020. The query revealed VACCARO's address at the time was 29501 N. 76th St., Scottsdale, Arizona. A query of the City of Scottsdale water billing customer database for 29501 N. 76th St. revealed VACCARO as a renter at the

address receiving water service from the City of Scottsdale. VACCARO provided telephone number (###) ###-7985 to the City of Scottsdale as his contact number for the account. This was the same number for VACCARO that Subject2 provided following his arrest.

23. VACCARO had communications with Subject2 about cocaine trafficking.

24. On November 1, 2020, investigators conducted a trash pull at VACCARO's residence located at 29501 N. 76th St., Scottsdale, Arizona. The trash bin was placed out for collection next to the road.

25. In the trash, investigators located an Alcatel Go Flip 3 T-Mobile box, a United Airline Flight baggage claim ticket dated October 11, 2020, for someone who is believed to be Subject2, and a clear heat-sealed vacuum bag that appeared to have been cut open, with "$20" written in black ink on the outside of the bag.

26. Based on training and experience, investigators know that drug traffickers often vacuum seal drug proceeds for transport and/or storage and often write the amount of currency contained in the vacuum sealed bag on the outside of the bag. In this instance, "$20" would likely be for $20,000 of drug proceeds.

27. The use of cellophane to wrap money or vacuum sealing money is a significant indication the money has a nexus to drug trafficking. *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 982 (9th Cir. 2002). Drug traffickers vacuum seal drug proceeds to minimize the risk of detection of narcotic odors on the currency by certified drug canines.

28. VACCARO's banking records indicate he was in California at the time of Subject2's arrest. VACCARO's debit card was utilized on May 30, 2019, at a Starbucks in Rancho Cucamonga, California and was also utilized at a Chevron in Calimesa, California on June 5, 2019, the date that Subject2 was arrested in California, which corroborates Subject2's statement that VACCARO followed Subject2 to California from Arizona each time a shipment of cocaine was to occur.

29. VACCARO has no known employment, has no known legitimate business,

5

1   and his family in Canada has never had any wealth.

2   ***Purchase of 6216 N. 38th Place, Paradise Valley, Arizona***

3       30.   On September 30, 2020, VACCARO purchased 6216 N. 38th Place, Paradise

4 Valley, Arizona 85253 for $3,500,000 (the "Paradise Valley Home").

5       31.   VACCARO made two down payments totaling $2,034,278 and obtained a

6 mortgage in the amount of $1,500,000.  The down payments were sent to WFG National

7 Title Insurance Agency in two separate wire transfers.

8       32.   According to bank records, the first wire transfer occurred on September 21,

9 2020 in the amount of $100,000 and was funded by an account at US Bank titled

10 Simmons and Gottfried PLLC.

11       33.   The second wire transfer occurred on September 30, 2020, in the amount of

12 $1,934,278.25, and was funded by an account at US Bank titled Simmons and Gottfried

13 PLLC Lawyers Trust Account (IOLTA).

14       34.   The original source of the funds that VACCARO used for the down payment

15 was a cash deposit totaling $2,999,940 into a US Bank account of Simmgott Properties

16 LLC.

17       35.   On September 15, 2020, VACCARO and his attorney, JS, brought two

18 suitcases and two duffle bags containing United States currency into the US Bank branch

19 in Phoenix, Arizona.

20       36.  The currency was in vacuum sealed bags with rubber bands binding numerous

21 stacks of currency.  The majority of the currency was twenty-dollar ($20) denominations

22 (totaling $2,748,680) and the remaining currency was in $100, $50, $10, and $5

23 denominations.

24       37.  As previously indicated, vacuum sealing money is a significant indication

25 money has a nexus to drug trafficking.  Moreover, a large amount of money with vast

26 majority of the bills in the twenty-dollar denomination is evidence that the money is

27 drug-related.  *United States v. $27,800 in United States Currency*, 2017 WL 6345394, at

28 *4 (S.D. Cal. Dec. 8, 2017); *United States v. Approximately $17,872 in United States*

1   *Currency*, 2009 WL 2990496, at *3 (N.D. Cal. Sept. 11, 2009) (stating the use of small

2   denominations contributes to finding money is connected to illegal activity).

3        38.  The $2,999,940 in cash that VACCARO deposited into the US Bank account

4   and thereafter used to make the down payment on the Paradise Valley Home was

5   proceeds of, or connected to, drug trafficking.

6   ***Purchase of Luxury Vehicles***

7        39.  Although VACCARO has no known source of legitimate income, from 2019

8   through 2022 he has purchased (with cash) or leased many expensive cars, including:

9       a.     2021 Mercedes Benz (VIN: W1K6X7GBXMA042090);

10       b.     2018 Can-Am (3JBVXAW41JK004198);

11       c.     2017 BMW X5 (5YMKT6C30H0U39534);

12       d.     2008 Extreme Boat (5DBBB34388R000011);

13       e.     2019 McLaren (SBM15ACA4KW800100);

14       f.     1999 Blue Nissan (BNR34004691);

15       g.     2009 black Mercedes Benz SL (WDBSK79F59F158216);

16       h.     2008 Black Porsche 911 (WP0AD29998S796186);

17       i.     2015 Black Porsche 911 (WP0CA2A19FS800340);

18       j.     2021 Black Lamborghini Aventador (ZHWUN6ZD2MLA10474);

19       k.     2021 Black Ram 1500 TRX (1C6SRFU98MN705736);

20       l.     2021 custom motorcycle (AZ381807);

21       m.     2021 custom motorcycle (AZ379594);

22       n.     2021 Black Ram 1500 TRX (1C6SRFU99MN905816);

23       o.     2020 Black Range Rover (SALGW2RE1LA579837);

24       p.     2018 McLaren (SBM14DCAXJW001585);

25       q.     2018 Rolls Royce (SCA666D50JU115829);

26       r.     2017 Mercedes (WDDWJ8HB3HF463468);

27       s.     2018 Porsche (WP0AE2A94JS185285);

28       t.     2016 Lamborghini (ZHWUF3ZD6GLA04984);

1          u.        2019 Lamborghini Urus (ZPBUA1ZL8KLA03725); and

2          v.        2020 Ferrari (ZFF90HLA9L0250501).

3      ***Vaccaro Conflicting Statements Regarding Source of His Wealth***

4          40.   In March of 2021, VACCARO purchased the 2008 black Porsche 911 (¶39(h)

5      above) from Darren Joyce for $290,000.

6          41.   Joyce stated that VACCARO paid cash for the vehicle and the transaction

7      took place within an office of Launch Auto Sports in Scottsdale, Arizona.

8          42.   Joyce stated the cash, mostly in 20 and 100-dollar bill denominations, was in

9      vacuum sealed packages with rubber bands.

10         43.   VACCARO told Joyce that he (VACCARO) was involved in commercial real

11     estate and construction.

12         44.   VACCARO is not involved in commercial real estate and construction.

13         45.   On June 11, 2021, VACCARO purchased the 2021 Dodge TRX (¶39(k)

14     above) from Pro Motorsports in Scottsdale, Arizona for $108,000 and paid cash for it.

15         46.   VACCARO told the seller that he stocked ATM's and that was why he had a

16     lot of 20-dollar bills.

17         47.   VACCARO has never stocked ATM's.

18         48.   On July 12 2021, VACCARO purchased a 2021 Dodge TRX (¶39(n) above)

19     from Mark Mercado for $85,000 and paid cash for it.

20         49.   VACCARO told Mercado that he (VACCARO) made most of his money

21     from a 3.5-million-dollar sale of a legal marijuana grow in California.

22         50.   VACCARO also told Mercado he also used to build homes in Canada for a

23     living.

24         51. VACCARO has never sold 3.5 million dollars of legal marijuana in California,

25     and upon information and belief he has never built homes in Canada for a living.

26         52.   VACCARO purchased three motorcycles from Corey Mauck and paid a total

27     of $112,000 in cash for them.

28

53.  John Barbuto owns Launch Auto Sports in Scottsdale, Arizona.  VACCARO contacted Barbuto in 2020 via Instagram.

54.   Barbuto advised when he first met him, VACCARO owned the following vehicles: a McLaren Senna, McLaren P1, Ferrari, Rolls Royce, Bentley, and a Lamborghini.  The Senna was worth approximately 1.2 million dollars and the McLaren P1 was worth approximately 1.3 million dollars.

55.   VACCARO initially told Barbuto that he (VACCARO) had a partner that started a business in Asia that conducted international wire transfers.

56.  VACCARO later told Barbuto that he was in construction and had a company in Canada.

57.  Barbuto also heard VACCARO say that he was a hard money lender.

58. VACCARO has never been in the business of international wire transfers, construction in Canada, or hard money lending.

59.   VACCARO asked Barbuto to deposit $500,000 cash into Barbuto's bank account.  While setting up the deposit with his bank, the bank advised Barbuto that the bank could send a Brink's truck the following day and, the bank needed VACCARO's driver's license to complete the deposit.

60. When Barbuto told VACCARO the bank needed his driver's license, VACCARO no longer wanted to make the deposit.

61.  VACCARO's reluctance to provide his driver's license to the bank in order to make the deposit is evidence the $500,000 was connected to drug trafficking.

62.  In March 2021, VACCARO gave $125,000 in cash to Barbuto and asked him (Barbuto) to wire transfer it for the purchase of a 2009 Mercedes SLS. The total cost of the Mercedes was $360,000 and VACCARO paid cash for the purchase.

***MB and C Plus Holdings LLC***

63.  MB is a partial owner of Launch Auto Sports and a custom home builder.

64. MB met VACCARO in September 2020. VACCARO told MB he had a background in construction in Toronto.

9

65. VACCARO has never worked in construction in Toronto.

66. VACCARO asked MB to come see the Paradise Valley Home and give a bid to remodel it. At this time, VACCARO was staying in a rental property for $10,000 per month.

67. VACCARO hired MB to start the remodel in October 2020, and initially gave MB $150,000 in rubber banded cash to get started. MB used some of the money to pay subcontractors and he deposited some of the cash in his bank account.

68. MB later told investigators that VACCARO gave him two additional cash payments of approximately $100,000 each.

69. MB said in total they probably had $700,000 invested in the remodel, and some of the money was MB's money.

70. VACCARO asked MB how much he should put into the Paradise Valley Home to flip it and MB suggested it would be over one million dollars.

71. VACCARO told MB he had one to 1.5 million dollars but wouldn't have money to live on if he spent it all. MB suggested getting a partner on the property. VACCARO agreed it would be best to pay off the house and give it to MB who could then get a home equity loan.

72. VACCARO had to deed the home to MB because VACCARO did not have a social security number and he could not qualify for the loan.

73. According to public records, on February 8, 2021, VACCARO executed a Quit Claim Deed and transferred ownership of the Paradise Valley Home to C Plus Holdings LLC.  MB is the sole member of C Plus Holdings LLC.

74. On February 8, 2021, C Plus Holdings LLC obtained a revolving credit line from Western State Bank in the amount of $2,800,000, using the Paradise Valley Home as collateral to secure the loan.  MB has stated that the reason for the large loan was because VACCARO told him he (VACCARO) would need 1.3 million for living expenses.

75.   MB said he and VACCARO opened three joint accounts at Western State Bank under C Plus Holdings LLC. The first was associated with the Paradise Valley Home, opened to deposit the funds from the eventual sale of the house.

76.   The second account was an investment account. MB and VACCARO deposited 2.5 million in this account from the home equity line of credit.

77.   The third and final joint account was an operating account. VACCARO began using the investment account and operating account as his personal accounts and used the money to buy and sell cars.

### *Purchase of the Holiday Drive Property*

78.   On November 15, 2021, VACCARO purchased the Holiday Drive Property. The purchase price was $4,500,000. VACCARO obtained a loan to complete the purchase of the property through Homebridge Financial Services.

79.   On September 28, 2021, VACCARO wire transferred $250,000 (earnest money) from a C Plus Holdings LLC account at Western State Bank.

80.   On November 12, 2021, VACCARO wired $1,315,000 from a C Plus Holdings LLC account at Western State Bank.

81.   These wire transfers from the C Plus Holdings LLC account are traceable to the revolving line of credit secured by the Paradise Valley Home, which VACCARO purchased with drug trafficking proceeds.

82.   The new loan for the Holiday Drive Property was $3,150,000.

83.   While VACCARO was attempting to secure a loan for the $3,150,000, VACCARO told MB that he (VACCARO) needed help to obtain the loan.

84.   A mortgage broker also called MB. The mortgage broker was concerned with VACCARO's loan application because although VACCARO claimed he was an owner of C Plus Holdings LLC he was not listed as an owner of public record with the Arizona Corporation Commission.

85.  MB told the mortgage broker that VACCARO had no ownership in C Plus Holdings LLC, so the mortgage broker asked him (MB) to execute an operating agreement listing VACCARO as a 100% owner.

86.  MB told the mortgage broker that he (MB) would not do that because his own personal house was also owned under C Plus Holdings LLC.

87.  MB and the mortgage broker agreed on an operating agreement showing VACCARO owned 51% of C Plus Holdings LLC and MB owned 49%.

88.  MB signed the operating agreement and back dated it to 2019, before MB even knew VACCARO.

89.  MB forged VACCARO's signature on the operating agreement.

90.  VACCARO needed the forged document to show ownership of C Plus Holdings LLC because he (VACCARO) did not have any legitimate employment or legitimate sources of income.

91.  Based on the forged signature and back dating, VACCARO's loan for the Holiday Drive Property was approved and funded.

92.  Throughout the investigation of VACCARO, investigators served numerous subpoenas on bank accounts used by VACCARO, conducted surveillance on VACCARO and interviewed numerous associates of VACCARO.  The investigation has not uncovered any evidence to support a legitimate source of income for VACCARO.

93.  VACCARO has given numerous conflicting statements as to the source of his funds. VACCARO has falsely claimed the source of his income and money to be from construction in Canada, servicing ATM machines, selling legal marijuana in California, hard money lending, and international wire transfers.

94.  VACCARO's inconsistent, contradictory, and false statements about the source of his money is further evidence that the money he used to purchase the Paradise Valley Home and the Holiday Drive Property is drug trafficking related and subject to forfeiture.  *See United States v. $242,484.00*, 389 F.3d 1149, 1164 (11th Cir. 2004) (finding claimant's inconsistent statements and changing stories are evidence of

1   forfeitability); *United States v. $22,474.00*, 246 F.3d 1212, 1217 (9th Cir. 2001)

2   ("[Claimant's] inconsistent statements about the money and his reasons for being in

3   Phoenix tended to support an inference that the money was drug-related."); *United States*

4   *v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir. 1992) ("[M]isstatements are

5   probative of possible criminal activity."); *United States v. $105,180 in U.S. Currency*,

6   2013 WL 2153326, at *9 (D. Ariz. May 17, 2013).

7           95.   To date, investigators have identified over five million dollars in cash

8   purchases and/or purchases directly related to cash deposits made at United States

9   financial institutions.

10                        **FIRST CLAIM FOR RELIEF**

11          96.   The Holiday Drive Property constitutes or is derived from proceeds traceable

12   to a violation of a specified unlawful activity, including but not limited to, wire fraud, 18

13   U.S.C. § 1343, and a drug trafficking offense, 21 U.S.C. § 841, *et seq.*, and therefore is

14   subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

15                       **SECOND CLAIM FOR RELIEF**

16          97.   The Holiday Drive Property was involved in a transaction or attempted

17   transaction in violation of a money laundering offense, 18 U.S.C. §§ 1956 and 1957, and

18   therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. §

19   981(a)(1)(A).

20           WHEREFORE, the United States of America prays that due notice be given to

21   all parties to appear and show cause why the forfeiture should not be decreed; that

22   judgment be entered declaring the defendants be forfeited to the United States of

23   America for disposition according to law; and that the United States of America be

24   granted such other and further relief as this Court deems just and proper, together with

25   //

26   //

27   //

28

13

1    the costs and disbursements of this action.

2            DATED this 28th day of April 2022.

3                                            GARY M. RESTAINO
                                             United States Attorney
4                                            District of Arizona

5
                                             *S/Mark J. Wenker*
6                                            MARK J. WENKER
                                             Assistant United States Attorney
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14